UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-20303-GAYLES

UNITED STATES OF AMERICA

v.

ALEXEY GIL,

        Defendant.
_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States, through undersigned counsel, respectfully submits this Memorandum in advance of the sentencing of defendant Alexey Gil ("Gil").

**I.    DEFENDANT'S CONDUCT.**

On or about May 11, 2021, Gil was indicted on one count of conspiracy to commit health care fraud and wire fraud (Count 1), and one count of conspiracy to commit concealment money laundering (Count 2). On April 19, 2023, Gil entered a guilty plea to Count 1. [D.E. 220]. Gil's signed factual basis accurately summarizes Gil's conduct and role in a widespread scheme to defraud Medicare through false claims for home health services and launder the fraud proceeds through multiple shell companies. [D.E. 219].

At the recent trial in the above-captioned matter against defendants Karel Felipe ("Felipe") and Tamara Quicutis ("Quicutis"), the United States proved that Alberto Gonzalez-Delgado ("Gonzalez-Delgado") and Eduardo Rubal ("Rubal") orchestrated and led a widespread conspiracy to attempt to steal over $93 million from Medicare. The conspiracy involved three home health companies located in Michigan: NuWave, Tri-County, and Care Home Health. Rubal and Gonzalez-Delgado recruited others into the scheme to help acquire home health companies and put them in the name of nominee owners, bill fraudulent claims to Medicare, recruit and control

nominee owners, move fraud proceeds between shell company bank accounts, and convert those proceeds to cash. Gonzalez-Delgado and Rubal operated the scheme from apartments in southwest Miami. Rubal also had a network of check cashing and money laundering groups operating on the street.

Evidence presented in the trial against Quicutis and Felipe demonstrated that Gonzalez-Delgado oversaw all aspects of the Medicare billing. Gonzalez-Delgado performed the billing from the apartments and created the procedure through which patients were targeted for billing. Patient identities were purchased or lifted from prior schemes. None of the patients gave consent for their identities to be used and none of the patients received the services for which the conspirators billed. Gonzalez-Delgado and Rubal enlisted others, including Alexey Gil, to create shell corporations and bank accounts for those corporations, all in the name of nominee owners who agreed to lend their identities to the scheme in exchange for money. Medicare fraud proceeds were transferred between accounts and ultimately cashed out. Conspirators wrote hundreds of checks between fake shell companies from the office apartments. Gonzalez-Delgado forged nominee owners' signatures on those checks. Rubal collected the checks and distributed them to money laundering groups on the street, who converted the checks to cash at banks, ATMs, and check cashing stores.

Testimony in the trial against Quicutis and Felipe, established that Gil's role in the scheme was to work with Jesus Trujillo and Vicente Acosta to recruit nominee owners, and use those owners to clean money for Eduardo Rubal. "He would just pretty much help me clean the money. He would receive [] the checks that were written and he would deposit into his own nominee, because he had his own nominee owners. And he would pretty much get the money into cash and bring the cash back." Tr. 9/26/23 at 159:4-10 (Rubal Testimony). Gil was one of the individuals working on the "streets" to convert checks from sham companies into cash for the operation. *Id.*

at 185:2-9; *see* 9/27/23 Tr. at 151:8-17 (Rubal testimony).  Gil and other money launderers took a percentage stake from the cash.  9/26/23 Tr. at 26:21-27:8 (Rubal testimony).  Testimony at trial established that Gil did not go to the office apartments where Gonzalez-Delgado ran the Medicare billing operation.  *Id.* at 159:15-23.  Testimony at trial also showed that Gil sold a house and luxury watches to Eduardo Rubal during the course of the scheme.  9/27/23 Tr. at 150:22-151:17; 153:21-154:3.

As set forth in Gil's factual basis, Gil and his co-conspirators recruited nominee owners to fraudulently purchase Tri-County.  Medicare paid approximately $7,771,884 for false claims submitted by Tri-County.  ECF 219 at 2. A financial analyst testified at trial to the movement of approximately $7,423,086 through dozens of bank accounts in the names of nominee owners and shell companies, much of which was converted to cash. *See* GX 759B.

## II.    SECTION 3553(a) FACTORS.

As this Court is aware, it must consider deterrence—both specific deterrence of the Defendant, and general deterrence—to keep others from committing similar offenses. As the Eleventh Circuit has noted, post-*Booker*: "[E]conomic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus these crimes are "prime candidate[s] for general deterrence." *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the *Martin* court noted that the legislative history of Section 3553 showed that Congress viewed deterrence as "particularly important in the area of white-collar crime. … even where [the defendant] might themselves be unlikely to commit another offense." *Id.* (emphasis added) (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Court in *Martin* held that "[d]efendants in white collar crimes often calculate the financial gain and risk of

loss, and white collar crime therefore can be affected and reduced with serious punishment." *Martin*, 455 F.3d at 1240. General deterrence is "particularly important in the area of white-collar crime," because would-be perpetrators are watching. *See id.*

Furthermore, the Eleventh Circuit has made clear that general deterrence is especially important in white collar offenses where greed is the motive. In *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014), the Court of Appeals rejected a probationary sentence for a white-collar defendant – even though the government had filed a 5K1.1 substantial assistance motion because: "general deterrence is an important factor in white collar cases, where the motivation is greed . . . we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others." *Id.* at 1308. The Court went on to say that the low sentence imposed conveys the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty," and accordingly was not just. Second, too low of sentences do not provide for general deterrence because "[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* at 1310-11.

More specifically, in a health care fraud case, the Eleventh Circuit delved deeper into the background of the § 3553(a) factors, in particular the general deterrence factor, and wrote:

> the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense. We stated that because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Our basis for this determination was that defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.

*United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (internal quotations and brackets omitted).

Gil accepted responsibility for his involvement in the charged scheme and has provided substantial assistance in the investigation and prosecution of others. The United States anticipates filing a separate motion for a sentence reduction based on Gil's substantial assistance.

Finally, in the table below, the United States sets forth the sentences imposed on other conspirators in the related case or, where the defendant has not yet been sentenced, the guidelines recommended in the parties' plea agreement (if applicable). The Court may consider these sentences in fashioning an appropriate sentence for Gil.

| Defendant Name | Case No. | Conviction | Sentence |
|---|---|---|---|
| Eduardo Rubal | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 210 months |
| Alberto Gonzalez-Delgado | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 210 months |
| Vicente Gonzalez Acosta | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 188 months |
| Alexander Fernandez | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 120 months |
| Yaxing Tapanes | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 97 months |
| Jose Carlos Valladares Rivera | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 97 months (sentence reduced to 68 months after Rule 35 motion) |

| Defendant Name | Case No. | Conviction | Sentence |
|---|---|---|---|
| Didier Arcia | 21-cr-20303-GAYLES | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 80 months (including reduction under section 5K1.1) |
| Hector Suarez Gonzalez | 19-cr-20354-SMITH | 18 U.S.C. § 1349 (conspiracy to commit health care fraud and wire fraud) | 78 months (sentence reduced to 48 months after Rule 35 motion) |
| Antonio Jimenez | 19-cr-20354-SMITH | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | 48 months |
| Jeffrey Avila | 21-cr-20303-GAYLES | 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) | Time served; 3 years supervised release |

Dated: October 30, 2023

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

By:   /s/ *D. Keith Clouser*
JAMIE DE BOER
Florida Special Bar No. A5502601
D. KEITH CLOUSER
Florida Special Bar No. A5502882
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 304-6801 (de Boer)
Tel.: (202) 256-0867 (Clouser)
Jamie.deBoer@usdoj.gov
David.Clouser@usdoj.gov

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on October 30, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

                                                    By:    */s/ D. Keith Clouser*
                                                                      D. KEITH CLOUSER
                                                                      Trial Attorney
                                                                      United States Department of Justice
                                                                      Criminal Division, Fraud Section